## STEAMBOAT MONOPOLY.

NORTH RIVER STEAMBOAT COMPANY *v.* LIVINGSTON, 3
Cow. 182.

Reported Hopkin's R. 150, 198.

THIS case, reversing all the previous decisions of the
courts of the state in support of the exclusive grant from the
legislature to Fulton and Livingston, of *navigating its waters
by steam*, was the last struggle in that memorable contest.
An ill-judged, though well meant liberality, had given an
invidious monopoly for a long term of years to the grantees,
and some stringent and novel legislation had so fenced it
round, that it was almost impossible to test the question of
*its constitutionality*, without at once submitting to an enor-
mous sacrifice. The history of the controversy is now pas-
sing into comparative oblivion; but its nature and the great
principles of constitutional law involved in it, will always
render it of the highest interest to American lawyers and states-
men. Although it is true, a mere wreck of the monopoly re-
mained after the decision of the Supreme Court of the Uni-
ted States, in the case of *Gibbons* v. *Ogden*, 9 Wheat. 1, yet
the waters of the state were not declared free to *its own citi-
zens*, until the decision of the Court of Errors in this case
had adopted the doctrines of the Supreme Court in that case,
as equally applicable to the citizens of the state, as to those
of other states. The records of this grant and consequent
litigation, are full of instruction to legislators; an incautious
liberality, or perhaps even a commendable spirit of munifi-
cence to a public benefactor, had imposed the most galling
fetters upon the general industry and enterprise of our citi-
zens in regard to steam navigation. The monopolists shut
their eyes to the precarious tenure by which all such exclu-
sive privileges, when they once became restraints on the
freedom of competition must ever be held, under a popular
government and an active commercial people.

The first step in the legislation on this subject, was a grant

by an act passed sixty years since, (March 19th, 1787,) entitled " an act for granting and securing to John Fitch the sole right and advantage of making and employing for a limited time *the steamboat by him invented.*"   The preamble to this act, recites that " whereas John Fitch, of Bucks county, in the state of Pennsylvania, hath represented to the legislature of this state, that he hath constructed an easy and expeditious method of impelling boats through the water by the force of steam, praying that an act may pass granting to him, his executors, administrators, and assigns, the sole and exclusive right of making, employing and navigating, all boats impelled by the force of steam or fire, within the jurisdiction of this state for a limited time.   Wherefore, in order to promote and encourage so useful an improvement and discovery and as a reward for his ingenuity, application and diligence," the first section then grants to Fitch the " sole and exclusive right and privilege of *constructing, making, using, employing, and navigating, all kinds of boats or water craft,*" by fire or steam in the waters of the state for 14 years from the end of that session of the legislature.

The second section imposed a penalty of £100 for every violation of this right, and a forfeiture of the boats or water craft, together with the steam engine, and all appurtenances, &c., of such boats.

How far Fitch attempted to put a boat in actual operation, impelled by fire or steam, accounts at this day are somewhat obscure and contradictory.   That so apparently easy an application of a motive power then so familiar to engineers and capitalists, should have stood still for so long a period after this grant, seems at this day, truly a wonder.   Nothing effectual, however, having been accomplished under the grant to Fitch, in 1798, Robert R. Livingston, then Chancellor of the state, applied to the legislature for a similar grant, and although the adoption of the constitution of the United States in the mean time, had subjected the navigable waters of the several states to the commercial legislation of Congress, no notice appears to have been taken of this important cession of jurisdiction to the general government, and an act was accordingly passed on the 27th of March, 1798, granting to Robert R. Livingston the exclusive privilege of using

14

steamboats in all the waters of the state, for a term of 20 years, and *repealing* the grant to Fitch.

On the 5th of April, 1803, was passed a further act entitled "An act relative to *a* steamboat," by which the rights granted to Livingston by the act of '98, were extended to R. R. Livingston and *Robert Fulton* for the term of 20 years from the passage of the act, and the term for giving the "necessary proof of the practicability of a boat of 20 tons capacity being propelled by steam through the water with and against the ordinary current of Hudson river taken together, FOUR MILES PER HOUR," was also extended two years from that date. By an act of 6th April, 1808, these privileges were extended for 30 years more, and violations of them were to be punished by forfeiture of the boat, &c.

By an act of April 9, 1811, an injunction was directed to be awarded to protect the grantees. The war was not however commenced in the courts for the destruction of this monopoly, until the case of

LIVINGSTON *v.* VAN INGEN, 9 J. R. 507.

In that case the grantees L. and F. filed their bill in Sept. 1811, against Van Ingen, Boyd, and 20 others, reciting their grants and various provisions of the acts, and charging that the defendants had set up a boat called the Hope, and were engaged in carrying passengers for hire between the city of New York and Albany, praying an injunction to restrain the defendants from running the boat, &c., upon the ground of the provisions of the acts of 1811, authorizing such an injunction.

The Chancellor (Lansing) refused to grant an injunction *ex parte*, but granted an order that the defendants show cause at the next term; where after hearing the parties, the Chancellor decided the motion, and the plaintiffs appealed to the Court of Errors. The Chancellor's opinion is reported in the above case.

The Chancellor seems to have been reluctant to decide the questions which he propounds as to the grant being contrary to the constitution of the United States, and goes no farther than to say that the "mere propounding them must

carry conviction to every mind that the subject is involved in much doubt and difficulty, and that it is not therefore a case so plain and clear as not to admit of doubt, and accordingly he declined in that stage of the cause to grant an injunction.

After a full and elaborate argument of all these questions, the Court of Errors held the grant valid under the constitution and laws of the United States. Kent, Ch. J., Yates, Van Ness, and Thompson, delivering opinions in favor of a reversal, and the order of the Chancellor was unanimously *reversed*, 12 March, 1812.

———

But a more formidable antagonist soon after entered the lists against the monopoly, who combined with great wealth, an energy of mind, character, and passions, of a very rare description. But whatever were his motives, the aim and result of his labors were to break down the monopoly, and to open the waters of the state of New York to the citizens of other states at all events. Being a citizen of New Jersey, he resolved to test the constitutionality of the grant in the Supreme Court of the United States. This litigant was the celebrated Thomas Gibbons.

The case of

OGDEN v. GIBBONS, 4 J. C. R. 150,

was the result of his open defiance of the monopoly. Gov. Ogden, the grantee of Livingston and Fulton, in that case, sought an injunction against Gibbons, on the ground of his own exclusive right to navigate the waters of New York bay, between New York city and Elizabethtown Point, on which Gibbons had commenced running a boat. The defendant set up that his two steamboats were vessels above the burthen of 20 tons, and were duly enrolled and licensed under the laws of the United States, to be employed in carrying on the coasting trade, according to the laws of the United States. He also set up a title by grant from D. D. Tompkins, and others, which it is not necessary to examine, as the point was not insisted on upon the argument of the appeal in the Court of Errors.

As to the right of navigating the waters of New York under the license, Chancellor Kent said, see 4 J. R. 150 *et seq.*, there was no collision between the grant and the license. If the state laws were "not absolutely null and void from the beginning, they require a greater power than a simple coasting license, to disarm them. We must be permitted to require at least, the presence and clear manifestation of some constitutional law, or some judicial decision of the Supreme Power of the Union, acting upon those laws, in direct collision and conflict, before we can retire from the support and defence of. them. We must be satisfied that

> *"Neptunus muros, magno que emota tridenti*
> *Fundamenta quatit."*

In the Court of Errors, upon the argument of the appeal, Henry, for the appellant Gibbons, said in concluding his argument: "We do not call to our aid Neptune with his trident, we invoke only the goddess Minerva."

Platt, J., who delivered the opinion of the court said the question of the power of the state to grant such an exclusive privilege of navigating its waters had been settled in the case of *Livingston* v. *Van Ingen*, (*ante*,) and it was no longer open for discussion.

The order of Chancellor Kent was unanimously *affirmed.*

From this decision of the Court of Errors, an appeal was taken to the Supreme Court of the United States, where in February, 1824, this great question was argued by Mr. Webster and Mr. Wirt, Attorney General, for Gibbons, and Mr. T. J. Oakley and Mr. Emmett for Ogden. 9 Wheat. 1–240.

The counsel for Gibbons contended:

1. That the power to regulate commerce, vested in Congress by the constitution, was complete and entire, and to a certain extent, necessarily exclusive.

2. That the grant in question came in direct collision with this exclusive power. The appellant had a right as a citizen of New Jersey, to go to New York in his vessel enrolled and licensed according to the laws of the United States. It was a right derived from those laws, and no legislation of a state could deprive him of it.

3. That the power of Congress to secure to authors and inventors a limited and exclusive right, was also an exclu-

sive one, and the power could not be properly exercised by a state.

The counsel for the respondents contended :

1. That the power to regulate commerce was *concurrent.*

2. That the laws in question were only a regulation of the internal navigation of the waters of the state, and therefore belonged *exclusively* to the state.

3. That the business of *carrying passengers* in which the appellant was engaged, was not covered by his coasting license.

In the conclusion of his argument, Mr. Emmett adverted in eloquent and characteristic terms to circumstances connected with those laws, which should make any tribunal require the strongest arguments before it adjudged them invalid. " The state of New York," he said, " by its patronage and liberality to Livingston and Fulton, has called into existence the noblest and most useful improvement of the present day. Genius had contended with its inherent difficulties for generations before; and if some had nearly reached, or some even touched the goal, they sunk exhausted, and the result of their efforts perished in reality, and almost in name. Such would have been the fate of Fulton, in all probability, but for this wise and considerate encouragement of the state of New York. She has brought into noonday splendor an invaluable improvement to the intercourse and happiness of men. The benefits of the policy have spread themselves over the union. The Ohio and Mississippi she has converted into rapid channels for communicating wealth, comforts, and enjoyments, from their mouths to their headwaters. And the inhabitants of the states washed by these streams, may well ask themselves whether next to the constitutions under which they live, there be a single blessing they enjoy from the art and labor of man, greater than that they have derived from the patronage of the state of New York to Robert Fulton? But the mighty benefits that have resulted from those laws are not circumscribed, even by the vast extent of our union. New York may raise her head—she may proudly raise her head—and cast her eyes over the whole civilized world ; she there may see its countless waters bearing on their surface, countless offsprings of her munificence and

wisdom.   She may fondly calculate on their speedy exten-
sion in every direction and through every region from Arch-
angel to Calcutta, and justly arrogating to herself the labors
of the man she cherished, and conscious of the value of her
own good works, she may turn the mournful exclamation
of Æneas into an expression of triumph, and exultingly·
ask,

     ‘ *Quæ regio in terris nostri non plena laboris ?*’ ”

The Attorney General, Mr. Wirt, in concluding his speech
in this cause, thus retorted the classical quotation of Mr.
Emmett upon him.

“ His learned friend had eloquently personified the state of
New York casting her eyes on the ocean, witnessing every-
where this triumph of her genius, and exclaiming in the lan-
guage of Æneas, &c.

“ It was not in the moment of triumph, nor with feelings
of triumph, that Æneas uttered that exclamation.   It was
when, with his faithful Achates by his side, he was survey-
ing the works of art with which the palace of Carthage
was adorned, and his attention had been caught by a repre-
sentation of the battles of Troy.   There he saw the sons of
Atreus and Priam, and the fierce Achilles.   The whole ex-
tent of his misfortunes, the loss and desolation of his friends,
the fall of his beloved country, rush upon his recollection.

   ‘ *Constitit et lachrymaus, quis jam locus inquit, Achate,*
     *Quæ regio in terris nostri non plena laboris ?*’

“ The passage may hereafter have a closer application to the
cause than my eloquent and classical friend intended.   For
if the state of things which has already commenced is to go
on ; if the spirit of hostility which already exists in three
of our states is to catch by contagion, and spread among the
rest, as, from the progress of the human passions, and the
unavoidable conflict of interests, it will too surely do, what
are we to expect?   Civil wars have arisen from far inferior
causes, and have desolated some of the fairest portions of the
earth.   Here are three states almost on the eve of war.   The
war of legislation which has already commenced, will, accor-
ding to its natural course, become a war of blows.   Your
country will be shaken with civil strife.

“ Then, sir, when New York shall look upon this scene of

ruin, if she have the generous feelings I believe her to have it will not be with her head aloft, in the pride of conscious triumph, her rapt soul sitting in her eyes—no sir, no—dejected —with shame and confusion—drooping under the weight of her sorrow, with a voice suffocated with despair, well may she then exclaim,

" Quis jam locus,
Quæ regio in terris nostri non plena laboris ?

Marshall Ch. J., delivered the opinion of the court, and of all those which bear his name on constitutional questions, it would be difficult to find one more closely reasoned and more conclusive. Our very brief summary can render it but little justice. The reader must have recourse to the opinion itself, if he would comprehend the close chain of induction which distinguishes it.

It clearly establishes by a variety of arguments and illustrations :

1. That the power to "regulate commerce" necessarily comprehends navigation.

2. That the exceptions or inhibitions to the exercise of that power over navigation in a particular manner, proved that the previous grant was understood by those who granted it, to include the general power to its fullest extent, except as restrained by those limitations.

3. That "commerce among the several states," comprehends every species of commercial intercourse ; that the word among means intermingled with ; and that the power to regulate such commerce does not stop at the external boundary line of each state, but follows it into the interior.

4. That the grants to Livingston and Fulton were in derogation of the act of Congress regulating the coasting trade, and therefore void, and that the license to carry on the coasting trade is an authority confirmed by the supreme legislative body of the Union, and that a coasting vessel employed in the transportation of passengers, is as much employed in commerce as one engaged in transporting a cargo.

5. That this power of regulating the coasting navigation, extends as well to steam vessels as to any other mode of propulsion.

The decree accordingly declared that "so much of the laws

of New York as prohibits vessels licensed according to the laws of the United States from navigating the waters of the state of New York by means of fire or steam, is repugnant to the constitution of the United States, and void."